# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

October 16, 2017

Lyle W. Cayce
Clerk

No. 16-41431

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

Plaintiff - Appellee

v.

YOSSEF KAHLON, also known as Jossef Kahlon; TJ MANAGEMENT GROUP, L.L.C.,

Defendants - Appellants

Appeal from the United States District Court
for the Eastern District of Texas

Before DAVIS, JONES, and SOUTHWICK, Circuit Judges.

PER CURIAM:

This case revolves around the purchases and sales of "penny stocks"[1] by Yossef Kahlon and one of his solely owned companies. In 2012, the United States Securities and Exchange Commission ("SEC") filed a complaint against Kahlon and his company for the purchase and resale of unregistered securities. The district court granted summary judgment on liability and later on

---

[1] "The term 'penny stock' generally refers to a security issued by a very small company that trades at less than $5 per share," and "[p]enny stocks generally are quoted over-the-counter." U.S. Sec. & Exch. Comm'n, *Penny Stock Rules*, https://www.sec.gov/fast-answers/answerspennyhtm.html (last visited October 13, 2017); *see also* 17 C.F.R. § 240.3a51-1 (technical definition).

No. 16-41431

damages in favor of the SEC.  Kahlon and the company timely filed this appeal as to both determinations.  We AFFIRM.

BACKGROUND

The facts of this case are not in dispute.  Section 5 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77e, requires that a detailed registration statement be filed with the SEC, unless an exception applies, before the offer or sale of securities to the public through interstate commerce.  The exception on which the penny-stock investor relies in this case is Rule 504(b)(1)(iii), 17 C.F.R. § 230.504(b)(1)(iii), the Seed Capital Exemption, which is designed for small companies to raise limited amounts of capital more easily by selling unregistered securities to accredited investors.

Yossef Kahlon is the sole owner, officer, and employee of TJ Management Group ("TJM"), a New York limited liability company created in 2003.  In 2005, TJM acquired 100 acres of vacant property in Dallas, Texas, which has never been used for TJM's operations.  That same year, Kahlon registered TJM in Texas as a foreign limited liability company, hired a registered agent in Texas, and obtained a Texas mailing address for TJM.  Kahlon administered TJM's operations with a New York bank account out of either his office in New York City or his home on Long Island.

Kahlon then started to invest in unregistered penny stocks through TJM based on Rule 504(b)(1)(iii) and the corresponding Texas state exemption, 7 TEX. ADMIN. CODE § 109.4.  Kahlon would identify penny stock companies that needed investment funds via alternative means of financing.  TJM would purchase large blocks of shares at a discount, while signing subscription agreements that provided the purchases were for "investment purposes and not with a view towards distribution[.]"  TJM was issued stock certificates without legends restricting their resale.  Notwithstanding its representation

to the issuer, TJM would then sell the stocks on the open market as soon as possible to generate a profit. For all but one of the 11 companies TJM invested in, resales of stock began within five days of its first purchase. All told, between May 2008 and 2010, Kahlon invested in 11 companies and purchased and sold over 18 billion unregistered shares for a gross trading gain of over $7.7 million.

In May 2011, after the SEC advised Kahlon that it was considering charges against him, he stopped conducting this form of transaction. In August 2012, the SEC filed a complaint in United States District Court for the Eastern District of Texas against Kahlon for TJM's unregistered sales. Two years later, both the SEC and Appellants filed motions for summary judgment. The district court granted the SEC's motion for summary judgment as to liability, denied Kahlon's motion, and ordered briefing on damages. The district court then held that Kahlon and TJM lacked the requisite geographic connection to Texas to take advantage of the state's blue-sky laws. The court did not reach the SEC's other theory of the case, that Kahlon and TJM were underwriters and therefore the unregistered securities were not freely transferable. The SEC moved for summary judgment on damages, and the district court granted relief in September 2016. The court ordered a permanent injunction against future Section 5 violations, disgorgement of over $7.7 million gross trading revenue plus prejudgment interest, a $200,000 first-tier civil penalty, and a lifetime penny-stock trading bar against Kahlon and TJM.

Kahlon and TJM timely filed this appeal and assert that the district court erred in granting summary judgment on liability and abused its discretion when awarding damages.

No. 16-41431

DISCUSSION

We review a district court's grant of summary judgment on liability *de novo*, and this court "may affirm the district court's decision on any basis presented to the district court" and argued in the district court. *Am. Family Life Assurance Co. of Columbus v. Biles*, 714 F.3d 887, 896 (5th Cir. 2013). The evidence is viewed in the light most favorable to the non-movants with all reasonable inferences drawn in their favor. *Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc.*, 738 F.3d 703, 706 (5th Cir. 2013).

The district court's damages and penalty determinations are reviewed for an abuse of discretion. *SEC v. Blatt,* 583 F.2d 1325, 1334 (5th Cir. 1978) (injunctive relief); *SEC v. AMX, Int'l, Inc.,* 7 F.3d 71, 73 (5th Cir. 1993) (disgorgement); *Wolf v. Frank,* 477 F.2d 467, 479 (5th Cir. 1973) (pre-judgment interest); *R&W Tech. Servs. Ltd. v. CFTC,* 205 F.3d 165, 177 (5th Cir. 2000) (civil penalties).

### I.      *Compliance with Rule 504(b)(1)(iii)*

To establish that Appellants – Kahlon and TJM – violated the registration provisions of Section 5 of the Securities Act, the SEC must make out a prima facie showing that "(1) no registration statement was in effect as to the securities, (2) the defendant sold or offered to sell these securities, and (3) interstate transportation or communication and the mails were used in connection with the sale or offer of sale." *SEC v. Cont'l Tobacco Co.*, 463 F.2d 137, 155 (5th Cir. 1972). Because these elements are undisputed, the burden shifts to the Appellants to show that the sales fell under an exception to the registration requirements. *Id.* at 156.

Appellants rely on Rule 504(b)(1)(iii), which allows offerings and sales to avoid registration requirements if they are conducted "[e]xclusively according to state law exemptions from registration that permit general solicitation and

No. 16-41431

general advertising so long as sales are made only to 'accredited investors' as defined in § 230.501(a)." 17 C.F.R. § 230.504(b)(1)(iii). Texas law exempts from registration the offer and sale of any securities to institutional accredited investors, as defined in 7 TEX. ADMIN. CODE § 107.2; to qualified institutional buyers, as defined in federal Rule 144A(a)(1) promulgated under the Securities Act; or to corporations and other entities with a net worth greater than $5 million. 7 TEX. ADMIN. CODE § 109.4 (West 2017).

The district court held that Rule 504(b)(1)(iii) requires compliance with "those state-law exemptions *where* the securities are offered or sold[.]" It found "no evidence that the transactions at issue took place exclusively under Texas law[.]" The court discussed the recent identical holding of another district court, which had cited the established principle that state securities laws (blue-sky laws) have survived constitutional challenges because "they only regulated transactions occurring within the regulating States" and because they are to that extent protected from preemption by Section 28(a) of the Securities Exchange Act. *See SEC v. Bronson*, 14 F. Supp. 3d 402, 408, 415 (S.D.N.Y. 2014) (citing *Edgar v. MITE Corp.*, 457 U.S. 624, 641 (1982)). Accordingly, an investor can only take advantage of a state's exemption if that state has the power to regulate the transaction to begin with.

Appellants complain that this enforcement proceeding is an effort to "'imply' an additional requirement into the exemption," "an impermissible use of enforcement to do what rulemaking did not," and that an SEC Compliance Guide issued in 2017 should govern. The SEC Compliance Guide was issued after the events herein, but in any event, it does more harm than good for their position. The guide requires that "[i]ssuers must comply with state securities laws and regulations *in the states in which securities are offered or sold*." U.S. Sec. & Exch. Comm'n, Rule 504 of Regulation D: A Small Entity Compliance Guide for Issuers (Jan. 20, 2017) (emphasis added).

5

No. 16-41431

Rule 504(b)(1)(iii) allows an exemption from registration for "offers and sales of securities . . . that are made . . . [e]xclusively according to state law exemptions from registration that permit general solicitation and general advertising so long as sales are made only to 'accredited investors' as defined in § 230.501(a)." 17 C.F.R. § 230.504(b)(1)(iii).[2] The *Bronson* court held that the regulation's use of the term "exclusively" "plainly require[s] that the offers or sales [be] exempt in each state where they occur[]." 14 F. Supp. 3d at 414. If not, one state would be able to exempt transactions occurring nationwide, despite another state's differing regulatory regime. The Supreme Court has indicated otherwise.[3] Thus general principles of federalism and the language of the regulation support the *Bronson* holding.

---

[2] There are three exemptions in 17 C.F.R. § 230.504(b)(1), and while only the third is in dispute in this case, it is helpful to view all three to put the relevant one in context.

> (1) *General conditions.* To qualify for exemption under this § 230.504, offers and sales must satisfy the terms and conditions of §§ 230.501 and 230.502 (a), (c) and (d), except that the provisions of § 230.502 (c) and (d) will not apply to offers and sales of securities under this § 230.504 that are made:
>> (i) Exclusively in one or more states that provide for the registration of the securities, and require the public filing and delivery to investors of a substantive disclosure document before sale, and are made in accordance with those state provisions;
>> (ii) In one or more states that have no provision for the registration of the securities or the public filing or delivery of a disclosure document before sale, if the securities have been registered in at least one state that provides for such registration, public filing and delivery before sale, offers and sales are made in that state in accordance with such provisions, and the disclosure document is delivered before sale to all purchasers (including those in the states that have no such procedure); or
>> (iii) Exclusively according to state law exemptions from registration that permit general solicitation and general advertising so long as sales are made only to "accredited investors" as defined in § 230.501(a).

[3] Since a trio of cases in 1917, the Supreme Court "has upheld the authority of States to enact 'blue-sky' laws against Commerce Clause challenges on several occasions. . . . The

No. 16-41431

Appellants argue that "the obligations 'implied' by the SEC and adopted by the district court are impossible to follow," amounting to "a repeal of the exemption[.]"    While Rule 504(b)(1)(iii) erects a higher bar than simply allowing a seller to adhere to a particular state's exception and then resell unregistered securities anywhere, it is not a destruction of the rule – purchasers of the stock may hold the stock, may resell exclusively within the state, or may resell in compliance with the rules of the purchaser's state or other subdivisions of Rule 504(b)(1).

Only one company that issued stock to TJM and Kahlon in this case was located in Texas.  The other ten issuing companies were located in other states or China.  Kahlon and TJM offered no summary judgment evidence that any of their transactions actually occurred in Texas.  Because states cannot regulate securities transactions occurring outside their borders, there is no reason to think that Texas's exemptions should apply to transactions occurring outside Texas.  As Appellants fail to identify anything in the summary judgment record that would show the transactions occurred in Texas, we affirm the summary judgment as to liability against TJM and Kahlon.

## II.    Remedies ordered by the district court

The district court permanently enjoined Kahlon and TJM from violating Section 5 of the Securities Act, ordered disgorgement of the gross revenue from the purchase and sale of unregistered securities and prejudgment interest, assessed a first-tier civil penalty, and permanently barred Kahlon and TJM from trading in penny stocks.  Appellants seek to overturn all these rulings, but the first-tier civil penalty is not seriously challenged.

---

Court's rationale for upholding blue-sky laws was that they only regulated transactions occurring within the regulating States." *Edgar*, 457 U.S. at 641.

No. 16-41431

*A. Bar on trading in penny stocks*

We now examine the permanent bar on trading in penny stocks. Such stocks must be for sale at less than $5 per share on the open market. Further, regulations define penny stock as "any equity security other than a security" that meets any of various potential requirements. 17 C.F.R. § 240.3a51-1. Just considering the stock price, it is evident that penny stocks can gain or lose that classification over time. Always being conscious of whether a particular transaction involves penny stocks is one of the obligations the injunction necessarily places on Kahlon.

Penny-stock transactions and those under Rule 504(b)(1)(iii) are not coterminous. That subpart of Rule 504(b)(1) allows an exemption from registration for "offers and sales of securities . . . that are made" "[e]xclusively according to state law exemptions from registration that permit general solicitation and general advertising so long as sales are made only to 'accredited investors' as defined in § 230.501(a)." 17 C.F.R. § 230.504(b)(1)(iii).

We now examine the district court's explanation for why Kahlon should be barred from penny-stock transactions and not just those exempted by Rule 504(b)(1)(iii). The district court's explanation partly relies on its prior analysis for injunctive relief, so we review both. In two separate sections of the remedies opinion, the district court identified lists of factors to consider. The court used the first set of factors to determine whether there was a reasonable likelihood of future violations and thus a need for a permanent injunction. The second set of factors concerned the propriety of a bar for future penny-stock transactions. We quote the first list, which the district court took from *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir. 2004):

> [1] egregiousness of the defendant's actions, [2] the isolated or recurrent nature of the infraction, [3] the degree of scienter involved, [4] the sincerity of the defendant's assurances against future violations, [5] the defendant's recognition of the wrongful

nature of the conduct, and [6] the likelihood that the defendant's occupation will present opportunities for future violations.

The district court also cited a district court opinion to support the factors. *See SEC v. Offill*, No. 3:07–CV–1643–D, 2012 WL 1138622, at *4 (N.D. Tex. Apr. 5, 2012) (Fitzwater, C.J.).

The second list used by the district court is quite similar and also has six factors. Chief Judge Fitzwater's *Offill* opinion was again cited. We mention the only factors from the list the district court used in deciding on a penny-stock bar that differ in substance from the first list: "the defendant's 'role' or position when he engaged in the fraud" and "the defendant's economic stake in the violation . . . ." These factors center on characteristics of the violator that are missing from the first list. This second list comes from a Second Circuit opinion addressing whether an individual was unfit to serve as an officer or director of a publicly traded company. *SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995) (citing Jayne W. Barnard, *When is a Corporate Executive "Substantially Unfit to Serve"?*, 70 N.C. L. REV. 1489, 1492–93 (1992)). Such a bar is not our issue, and these two factors do not further our analysis.

When analyzing a case, lists of factors such as in *Patel* generally are not exclusive, nor is each factor always relevant. Circumstances can alter what facts should be evaluated. Factors are meant to guide courts as they consider evidence in a case and form remedies. We quoted one of the lists the district court used because it is the articulation adopted by this court in a 1978 opinion, with instructions to trial courts that they were to consider these "factors in deciding whether to issue an injunction in light of past violations" of SEC regulations and related statutes. *Blatt*, 583 F.2d at 1328 & n.29. The *Blatt* list is appropriate to use here on the question of the form of the injunction.

The district court analyzed some of the six factors taken, ultimately, from the Second Circuit *Patel* opinion, but it did not discuss those that differ

from the list we adopted in *Blatt* presumably because they had no relevance. The court concluded that a permanent bar on trading in penny stocks was appropriate. The written explanation was not extensive:

> The court finds that a penny stock bar is warranted "for essentially the same reasons that support entry of an injunction[.]" *Offill*, 2012 WL 1138622, at \*5. Since the Defendants sold unregistered securities, either intentionally or with reckless disregard for the registration requirements, at a volume that netted over $100,000 a month at their peak, the court finds that the entry of a permanent penny stock bar is warranted because the Defendants "could easily repeat this conduct." *Id*.

The court's explanation of its penny-stock bar says it was justified for reasons similar to those supporting an injunction, which leads us back to the district court's use of the *Blatt* factors.

In its application of the *Blatt* factors, the district court considered Kahlon's argument that he lacked scienter. The district court rejected this argument both in its opinion on liability and the one on remedies. In both, the court wrote:

> Defendant contends that the fact that the SEC had interviewed and requested documents from Kahlon in connection with two other investigations but did not bring this enforcement action until much later somehow means that the SEC "explicitly permit[ted]" his conduct. Defendant has put forth no evidence showing the SEC had previously interpreted the exemption on which he relies in a manner that is contrary to the interpretation which it asserts here. "As stated by one court, 'neither a good faith belief that the offers or sales in question were legal, nor reliance on the advice of counsel, provides a complete defense to a charge of violating Section 5 of the Securities Act.'"

The court concluded that Kahlon acted either intentionally or with reckless disregard for the legal requirements.

To support at least recklessness and perhaps also intent, the district court described the SEC's argument that Kahlon, in seeking an attorney opinion letter blessing his actions, had not been candid in explaining his plans

to counsel. Particularly, as the district court found in the remedies opinion, Kahlon and TJM had failed to explain "(1) their intent to publicly distribute shares as soon possible, or (2) the suggestion that the Defendants' operations and investment decisions were based in Texas." Though the district court did not then explicitly rely on those facts, the court did find that the evidence supported that Kahlon had acted intentionally or recklessly. The district court expressed a similar concern in the opinion on liability. It pointed out that Kahlon had misrepresented to brokerage houses and others who dealt with him that he had a presence in Texas and that he was purchasing the stock as an investment. The court found both characterizations to be contradicted by his deposition.

Even if it is fair to characterize the violations as "technical," meaning we suppose that they did not lead to any specific economic loss to anyone, they are still reckless and quite likely knowing violations. We see no innocent straying across hidden limits but instead a well-planned march beyond the boundaries that were sufficiently marked for investors.

In our review, we acknowledge that the district court found Kahlon and TJM liable only for violations of Rule 504 yet barred further transactions of penny stocks. Despite Kahlon's argument that a bar on Rule 504 transactions was sufficient, the district court determined that the SEC's request for a bar on all penny-stock transactions was more appropriate. Our review of the details of the injunction is for an abuse of discretion. *Blatt*, 583 F.2d at 1334.

We find few clear limits on the district court's discretion. Some cases arguably present more wide-ranging violations than occurred here. *SEC v. Curshen*, 372 F. App'x 872, 875 (10th Cir. 2010) ("Curshen's conduct violated 15 U.S.C. § 78j(b) ("§ 10(b)"), 15 U.S.C. § 77q(a) ("§§ 17(a)(1)–(3)"), 15 U.S.C. § 77q(b) ("§ 17(b)"), and 17 C.F.R. § 240.10b–5 ("Rule 10b–5")."); *SEC v. Simmons*, 241 F. App'x 660, 662 (11th Cir. 2007) ("Siciliano had committed

No. 16-41431

securities fraud and violated the registration provisions of the securities laws."). Here, Kahlon and TJM's misconduct was limited to one kind of violation. Still, the district court had a choice on the form of injunction based on the fact that these parties had violated a particular rule when conducting a particular kind of transaction. Perhaps the district court considered that Kahlon and TJM had evidenced sufficient sophistication in conducting penny-stock transactions as to raise legitimate concerns that other limits on those transactions might be violated in the future. The district court did not give us much to go on, but it did make a finding of reckless and potentially intentional misconduct while engaging in penny-stock transactions.

We find no abuse of discretion in barring all future transactions.

### B.  Injunction from future securities law violations

We also affirm the permanent injunction from future securities law violations. This permanent injunction is tailored to the precise misconduct as it proscribes Kahlon and TJM "from violating Section 5 of the Securities Act." *SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. Unit A July 1981). We find no abuse of discretion in ordering the permanent injunction.

### C. Disgorgement of all revenue

Turning next to the district court's order that Kahlon and TJM disgorge all gross revenues and the corresponding prejudgment interest, we affirm. "The court's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing. Any further sum would constitute a penalty assessment." *Blatt*, 583 F.2d at 1335. "The purpose of disgorgement is not to compensate the victims of the fraud, but to deprive the wrongdoer of his ill-gotten gain." *Id.* The question in this case is whether the district court erred in determining that profit was best measured

as gross revenue and not net profit.  "[T]he overwhelming weight of authority hold[s] that securities law violators may not offset their disgorgement liability with business expenses." *SEC v. United Energy Partners, Inc.*, 88 F. App'x 744, 746 (5th Cir. 2004) (quoting *SEC v. Kenton Capital, Ltd.,* 69 F. Supp. 2d 1, 16 (D.D.C. 1998)).  We hold that the district court did not abuse its discretion.

AFFIRMED.

No. 16-41431

EDITH H. JONES, Circuit Judge, dissenting:

I respectfully dissent from the majority's decision to throw the book at these defendants—approving an injunction, a lifetime ban on all "penny stock" trades, a civil penalty, and disgorgement of gross revenues. Yet no fraudulent injury occurred to the sophisticated actors with whom they traded or the penny stock market more generally. The district court's perfunctory analysis of the six factors used to justify such harsh penalties is insufficient. There is no justification for a lifetime penny stock bar under the circumstances of this case. Finally, the requirement of disgorging gross revenues conflicts with *SEC v. Blatt,* 583 F.2d 1325 (5th Cir. 1978), the principal authority cited by the panel majority.

The SEC acknowledges that this is a strict liability violation for which no proof of scienter was required. Moreover, only one meaningful district court precedent, which postdated these appellants' trades, spoke to the required location of the transactions controlling the Rule 504(b)(1)(iii) exemption. The panel majority must stretch to infer from the district court's opinions that Kahlon and TJM committed "reckless and quite likely knowing violations" of the Rule. The majority admit that the district court's findings were not "extensive," not "explicit," and "did not give us much to go on." Because SEC was not required to bear a burden of proving scienter for the initial violation, and no evidentiary hearing took place, it is at best conjecture that Kahlon and TJM were intentional or willful violators. There is no evidence that they have been repeat securities law offenders: while they used this Rule's exemption in the same way many times, once the SEC notified him that it was considering charges, Kahlon and TJM immediately ceased engaging in these Rule 504 transactions. There is no evidence that such misconduct will recur now that the transactions have been adjudicated deficient. Also of significance, there

14

was no proof of fraud committed upon the entities from which Kahlon and TJM purchased stock or upon the sophisticated markets in which they sold. There were, in sum, no egregious underlying securities violations.

For the technical violations that occurred, however, I agree that several sanctions, including the permanent injunction against further securities law violations and the civil penalty, should be upheld.

But the ban against these appellants' ever engaging in penny stock trades, in my view, far exceeds the district court's discretion. Disturbingly, the panel majority purports to "find few clear limits on the district court's discretion" in issuing this ban. That is not consistent with *SEC v. Blatt,* 583 F.2d 1325, 1334 (5th Cir. 1978). In *Blatt,* the court held that:

> the critical question in issuing the injunction and also the ultimate test on review is whether defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future. To obtain injunctive relief the Commission must offer *positive proof* of the likelihood that the wrongdoing will recur. *SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d 90, 99-100(2d Cir. 1978). *The Commission needs to go beyond the mere fact of past violations. Id.*

 *Id. (*emphasis added). In *Blatt,* unlike this case, the defendants violated SEC Rule 10b-5 by engaging in blatant and misleading nondisclosures during a contested acquisition. In *Blatt,* unlike this case, the appellate court reviewed factual findings made following a trial. The record here, I respectfully submit, fails to go "beyond the mere fact of past violations."

In addition to the lack of "proof positive" compatible with *Blatt,* the bar on any future penny-stock trades is overbroad because it places these defendants at risk under circumstances wholly beyond their control. The majority acknowledges that not all penny stock transactions are Rule 504 transactions. Kahlon's and TJM's abuse of the rule governing purchases of

No. 16-41431

unregistered securities directly from companies should not bar them permanently from investing in over-the-counter securities.

To begin, the price of a stock can fluctuate above or below $4.99/share on the open market, so a penny stock today may not be one tomorrow, and vice versa. Moreover, the regulations define penny stock as "any equity security other than a security" that meets any of a number of potential requirements. These extrinsic factors create more ways for a penny stock to become not a penny stock and vice-versa.[1]  17 C.F.R. 240.3a51-1. Given the amount of legitimate trading activity this ban will proscribe, a broad permanent penny stock bar is an abuse of the district court's discretion.[2]

As the relevant factors imply, any ban on trading must be tailored to the degree of misconduct. This is not a case where Kahlon and TJM have systematically abused penny stock offerings, resulting in numerous regulatory

---

[1] The regulation governing what is a penny stock includes qualifications entirely in the hands of the issuer (17 C.F.R. 240.3a51-1(g)). For example, Kahlon could purchase stock from a one year old issuer with two million dollars in net tangible assets, but if in year two the issuer dips below two million in net tangible assets, the stock becomes a penny stock. Other qualifications are left entirely in the hands of the marketplace (240.3a51-1(d)). Finally, whether a stock can qualify as a penny stock may be determined by certain securities exchanges, e.g., if the stock is removed from the exchange, if the exchange decides to stop reporting certain information, or the stock fails to meet other ongoing qualification requirements (240.3a51-1(a), (e)). Obviously, if Kahlon purchased a stock valued at $6/share, but it declined to $4/share, he would be barred from selling or trying to sell it. But his risk goes well beyond market value fluctuations to the other rules governing these stocks.

[2] "The impact of a Penny Stock Bar is that the individual is barred from acting as a promoter, finder, consultant or agent or otherwise engaging in activities with a broker, dealer, or issuer for the purpose of the issuance or trading in any penny stock, or inducing or attempting to induce the purchase or sale of any penny stock." Brenda Hamilton, *What is a Penny Stock Bar?*, Securities Lawyer 101 (August 2, 2014), https://www.securitieslawyer101.com/2014/penny-stock-bar/. *See also* David Smyth, *Don't Even Think About Violating That Penny Stock Bar*, The National Law Review (June 13, 2016), https://www.natlawreview.com/article/don-t-even-think-about-violating-penny-stock-bar (Wise violated a penny stock bar when he "solicited several private companies to issue publicly trading shares, pitched the offerings to a New York-based hedge fund, and helped the private companies prepare to offer the shares to the public.").

16

violations; instead, they exploited one rule to conduct their transactions. In other cases, the defendants violated multiple provisions of the Securities Act and the Exchange Act, notably including allegations of fraud, while trading penny stocks, so a broad penny stock bar was warranted. *See S.E.C. v. Gillespie*, 349 F. App'x 129, 130 (9th Cir. 2009) ("Gillespie violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act."); *S.E.C. v. Curshen*, 372 F. App'x 872, 875 (10th Cir. 2010) ("Mr. Curshen's conduct violated 15 U.S.C. § 78j(b) (" § 10(b)"), 15 U.S.C. § 77q(a) ("§§ 17(a)(1)–(3)"), 15 U.S.C. § 77q(b) (" § 17(b)"), and 17 C.F.R. § 240.10b–5 ("Rule 10b–5")."); *S.E.C. v. Simmons*, 241 F. App'x 660, 662 (11th Cir. 2007) ("Siciliano had committed securities fraud and violated the registration provisions of the securities laws."). In the *Offill* case, the district court tailored a penny stock ban, limiting it to seven years for some defendants to protect the public without "over-punishing these defendants . . . ." *S.E.C. v. Offill*, No. 3:07-CV-1643-D, 2012 WL 1138622, at *5 (N.D. Tex. Apr. 5, 2012). The court imposed a permanent penny stock ban only on the former SEC lawyer whose "knowledge and experience as a securities regulator make him especially dangerous to the investing public." *Id.* at *6. No nuanced findings or balancing occurred here.

Because Kahlon and TJM violated one provision, were not found guilty of fraud, immediately ceased Rule 504 transactions after being singled out by the SEC, and have agreed not to engage in any further transactions based on that rule, a tailored ban would only prevent them from engaging in any Rule 504 transactions.

Next, I turn to the disgorgement and prejudgment interest calculation, which are based not on lost profits but on the gross revenues received by the appellants. This court observed only in an unpublished, non-precedential decision that "the overwhelming weight of authority hold[s] that securities law

violators may not offset their disgorgement liability with business expenses." *SEC v. United Energy Partners, Inc.*, 88 F. App'x 744, 746 (5th Cir. 2004). This statement is overbroad at best:  the "overwhelming majority" of SEC enforcement actions involve fraud, where the SEC has proven an offender's scienter and the harm done to others.  Even more pointedly, the *Blatt* case, on which the majority relies, did not result in disgorgement based on gross revenue achieved by a securities law violator, but only on "the profits that he had realized through violation of the [SEC] Act…"  *Blatt,* 583 F.2d at 1327. (*Compare Id.* at 1328, noting the sale of Pullman's stock for $375,000, yielding an approximate profit of $315,000; only the latter amount was required to be disgorged.)  Disgorgement, if appropriate at all, should be remanded for reduction in line with *Blatt*.

As an aside, the district court appears to have adopted remedies relying on the underwriter theory of the case, on which it did not rule, rather than the Rule 504 transactions on which it actually found liability.  Had Kahlon and TJM been prosecuted and held liable as underwriters this sweeping range of punishment would have made more sense.  Underwriters, after all, are responsible for distributing securities into the market at large.  Because the district court decision is based only on a technical strict liability violation, I consider the aggregate of these penalties an abuse of discretion.

Finally, I find it troubling that Kahlon and TJM never had a chance to present their case orally before the district court.  A pretrial order set the timetable leading to the trial on remedies, and it was followed until about a week before trial.  Then counsel for both parties informed the court that they were only planning to offer arguments at the remedy phase, but no additional evidence.  The district court not only cancelled the trial, but also denied Kahlon's specific request to permit argument, and accepted every bit of SEC's

punitive remedies—a civil penalty, injunction against future SEC violations, disgorgement of gross revenue gained plus interest, and the lifetime penny stock trade ban.

The panel majority's insistence on this plethora of punishments, including the disgorgement of gross revenues plus interest treats this case, inappositely, as if Kahlon and TJM had stolen from widows and retirees. Equally inapt, in light of *Blatt*, is the nostrum that "there are few clear limits on the district court's discretion." If federal courts decline to exercise proportionality in penalizing technical regulatory violations, then one can only hope that a federal agency with such enormous power as the SEC will learn to better fit the punishments to the crime. I respectfully dissent.