United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 7, 2005**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 04-50468

JAMES B. TENNY,

Petitioner-Appellee,

versus

DOUG DRETKE, Director, Texas Department of Criminal Justice,
Correctional Institutions Division,

Respondent-Appellant.

Appeal from the United States District Court
for the Western District of Texas

Before HIGGINBOTHAM, SMITH, and BENAVIDES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

James B. Tenny was convicted in a Texas state court of the murder of Joyce Mulvey, the woman with whom he was living at the time. After unsuccessful state habeas proceedings, Tenny turned to federal court. The federal district court granted habeas relief based on trial counsel's failure to adequately investigate and elicit crucial evidence of self-defense. We affirm.

I

In 1997, Tenny and Mulvey were living together in Blanco, Texas. Mulvey worked as an attendant at Elder Haus, a residential facility for the elderly, located on the grounds of Christ of the

Hills Monastery.  On May 12, 1997, Tenny and Mulvey had a violent

altercation resulting in Mulvey's death.  The district court below

recounted the facts and state trial testimony surrounding the fight

as follows:

> On the night of her death, May 12, 1997, Joyce Mulvey and Jim Tenny had an argument over Tenny moving out of their house so he could have his son come live with him.  Tenny testified he left the room to allow things to "cool down" and upon returning to the kitchen, Mulvey attacked him with a gas can.  Mulvey sloshed gasoline into Tenny's eyes and all over his body.  Tenny further testified he could hear the clicking of a lighter and saw Mulvey approaching with a lighter.  The fight escalated from there with Tenny punching Mulvey to keep her away.
>
> Tenny called 911 at 9:28 p.m. requesting help because "[his] old lady [wa]s trying, trying to burn down the house."  According to Tenny, Mulvey then smashed a platter over his head, thereby ending the emergency call.  Mulvey continued her attack on Tenny with a butcher knife and they engaged in a violent struggle for the knife in which Tenny sustained several injuries, including a stab wound to his chest, which collapsed his lung.  Tenny then stabbed Mulvey believing it necessary to defend his own life and caused the death of Mulvey.[1]

On May 14, 1999, a jury found Tenny guilty of murder,

rejecting his contention that the act had been in self-defense.

The court sentenced him to 65 years, rejecting Tenny's sentencing-

phase mitigation argument--specifically, sudden heat of passion--

which would have capped his sentence at 20 years.  The state

---

[1] *Tenny v. Cockrell*, No. 1:01-CV-409-SS, at 3-4 (W.D. Tex. Apr. 5, 2004) (unpublished) (citations omitted).

appellate court affirmed and Tenny did not seek discretionary review by the Texas Court of Criminal Appeals.

Tenny filed a state habeas petition arguing, *inter alia*, ineffective assistance of counsel (IAC) in developing his claims of self-defense and mitigation. The state habeas court declined to grant Tenny's petition,[2] and on April 11, 2001, the Texas Court of Criminal Appeals denied Tenny's application without an opinion and without a hearing.[3]

Tenny then filed a habeas petition in federal court. The magistrate judge held an evidentiary hearing and issued a recommendation. The district court granted relief, holding that the state court unreasonably concluded that Tenny had not received ineffective assistance from his trial counsel.[4] The State appealed. Tenny did not file a cross-appeal.

II

We review the district court's findings of fact for clear error and its conclusions of law *de novo*.[5] "As claims of ineffective assistance of counsel involve mixed questions of law

---

[2] *See id.* at 3. The state court's findings of fact only made reference to Tenny's contention in his habeas petition that his counsel had a conflict of interest. *Id.* The court otherwise ignored Tenny's IAC habeas arguments.

[3] *See id.* at 2.

[4] The district court also made rulings adverse to Tenny, concluding that several affidavits offered at the evidentiary hearing were unexhausted and rejecting other bases for habeas relief.

[5] *Schaetzle v. Cockrell*, 343 F.3d 440, 443 (5th Cir. 2003); *Martinez v. Johnson*, 255 F.3d 229, 237 (5th Cir. 2001).

and fact, they are reviewed *de novo*."[6]

A

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d), a writ of habeas corpus will not issue unless the state habeas court's adjudication of Tenny's IAC claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.[7]

We focus here on § 2254(d)(1)--that is, on whether the state habeas court's decision was an "unreasonable application" of *Strickland v. Washington*.[8] In making this inquiry we "ask whether the state court's application of clearly established federal law was objectively unreasonable," and we are mindful that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law."[9] Further, we are "authorized by

---

[6] *Lewis v. Dretke*, 355 F.3d 364, 366 (5th Cir. 2003) (per curiam).

[7] 28 U.S.C. § 2254(d)(1)-(2); *see Riddle v. Cockrell*, 288 F.3d 713, 716 (5th Cir. 2002); *see also Martinez v. Dretke*, 404 F.3d 878, 884 (5th Cir. 2005).

[8] 466 U.S. 668 (1984).

[9] *Williams v. Taylor*, 529 U.S. 362, 409, 410 (2000); *see also Rompilla v. Beard*, 125 S. Ct. 2456, 2462 (2005); *Brown v. Payton*, 125 S. Ct. 1432, 1438-39 (2005).

4

[§] 2254(d) to review only a state court's 'decision,' and not the written opinion explaining that decision."[10]

## B

Tenny asserts an IAC claim based on his trial counsel's failure to investigate adequately and elicit testimony germane to Tenny's theory of self-defense. The law is clear: Tenny's claim is measured against the familiar *Strickland* tandem of deficient performance and prejudice.[11]

A deficient performance is conduct beyond the bounds of prevailing, objective professional standards.[12] We accord substantial deference to counsel's performance, applying the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."[13] "[E]very effort must be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged

---

[10] *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc); *see id.* ("[O]ur focus on the 'unreasonable application' test under [§] 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence.").

[11] 466 U.S. at 687; *see also Williams*, 529 U.S. at 391 ("It is past question that the rule set forth in *Strickland* qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'"); *Schaetzle*, 343 F.3d at 443-44.

[12] *Strickland*, 466 U.S. at 687-88.

[13] *Id.* at 689 (internal quotation marks and citation omitted); *see also Titsworth v. Dretke*, 401 F.3d 301, 310 (5th Cir. 2005).

5

conduct, and to evaluate the conduct from counsel's perspective at the time."[14]

Prejudice is established by a demonstration of a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[15] A reasonable probability is "a probability sufficient to undermine confidence in the outcome."[16] "[A] defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case."[17]

In light of the AEDPA, the test for federal habeas purposes is not merely whether a defendant made the requisite *Strickland* showing, but, instead "the test is whether the state court's decision--that [a defendant] did *not* make the *Strickland*-showing-- was contrary to, or an unreasonable application of, the standards, provided by the clearly established federal law (*Strickland*), for succeeding on his IAC claim."[18] We are persuaded that Tenny has satisfied the heightened standard prescribed by the AEDPA.

C

We turn first to deficiency. The district court held that,

---

[14] *Strickland*, 466 U.S. at 689.

[15] *Id.* at 694; *see also Williams*, 529 U.S. at 391.

[16] *Strickland*, 466 U.S. at 694.

[17] *Id.* at 693.

[18] *Schaetzle*, 343 F.3d at 444.

6

insofar as the state court found no deficiency in counsel's performance,[19] the state court's decision was an unreasonable application of *Strickland*. The State, in its opening brief, does not challenge this holding and we thus consider the issue waived.[20] In its reply brief, the State argues that it did not waive the issue because it "is not unusual for IAC analysis" to assume deficient performance *arguendo* and to focus on the prejudice prong. This argument is meritless. While the cases cited by the State aptly illustrate that <u>we</u> often opt to decide an IAC claim based solely on one of the two prongs,[21] that does not give the State license to argue one prong to the exclusion of the other and expect the latter issue not to be waived. Had the State actually challenged the district court's holding on the first prong and *then* proceeded "*arguendo*," it would, of course, be a different matter.

---

[19] The state habeas court denied relief on this IAC claim without explanation. While we cannot say whether the state court denied the claim for lack of deficiency or for lack of prejudice, we will assume for purposes of this analysis that the state court found both to be lacking.

[20] *See Tharling v. City of Port Lavaca*, 329 F.3d 422, 430 (5th Cir. 2003) (party waived issue by failing to raise it in opening brief); *Lockett v. EPA*, 319 F.3d 678, 684 n.16 (5th Cir. 2003) ("To the extent that appellants attempt to raise the issue . . . in their reply brief, we view the issue waived."); *Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 179 (5th Cir. 2000) ("We do *not* consider any of [the issues], because they were *not* raised in the parties' opening briefs."); *United States v. Jackson*, 50 F.3d 1335, 1340 n.7 (5th Cir. 1995) ("It is well-settled that, generally, we will not consider issues raised for the first time in a reply brief."); *see also Nixon v. Epps*, 405 F.3d 318, 323 (5th Cir. 2005).

[21] *See Harris v. Cockrell*, 313 F.3d 238, 243 (5th Cir. 2002); *Johnson v. Cockrell*, 301 F.3d 234, 239 (5th Cir. 2002); *see also Johnson v. Dretke*, 394 F.3d 332, 337-38 (5th Cir. 2004) ("Because Johnson has not met the first prong of *Strickland*, we need not reach the question of prejudice . . . .").

7

D

The prejudice here is plain.  The district court pointed to ample unpresented evidence--evidence that would plainly be vital to Tenny's success on self-defense.  As the district court expressed it, Tenny did not "elicit any critical testimony supporting Tenny's sole defense."[22]  His counsel failed to investigate and call witnesses, including two monks and a nun, and failed to elicit important testimony from witnesses, including a doctor, who were called.[23]

Much of the evidence that never reached the jury, including evidence of Mulvey's threats on Tenny's life, would clearly have been useful to Tenny's theory of self-defense by demonstrating that Tenny had a "reasonable apprehension" and that Mulvey was the aggressor.[24]  Specifically, the omitted evidence indicated that Mulvey threatened to kill Tenny in the days leading up to--and even

---

[22] *Tenny*, No. 1:01-CV-409-SS, at 16; *see also id.* at 22 (noting that Tenny's lawyer abandoned self-defense).

[23] The attorney failed to fully investigate and call Florence Parker and Mother Seraphima.  *Id.* at 16-18.  He investigated but failed to call Father Benedict and Father Jeremiah.  *Id.* at 19-20.  He called but failed to elicit key testimony from Dr. William Penn, Joseph Swift and Tenny himself.  *Id.* at 20-21.
   The district court considered only the missing testimony of these six individuals--in addition to Tenny himself--because their affidavits were previously presented to the state court.  *Id.* at 16; *cf. id.* at 6-13 (declining to consider declarations of certain other individuals based on lack of exhaustion).  Without offering comment on the court's decision to restrict its inquiry, we confine our analysis to the same set of individuals.

[24] *See, e.g.*, *Tate v. State*, 981 S.W.2d 189, 193 (Tex. Crim. App. 1998) (holding in self-defense case that victim's prior threat on life of defendant, even though made two months prior to victim's death, is probative of defendant's reasonable apprehension and victim's aggression).

8

on the very day of--the fight that resulted in Mulvey's death;[25] Mulvey was "agitated, argumentative, and threatening" on the day of the fight;[26] Tenny was warned on the day of the fight that Mulvey intended to kill him;[27] Mulvey had stabbed Tenny on the Friday before the fight,[28] Mulvey threatened to burn the house down;[29] Mulvey exhibited violent tendencies and "was prone to 'fly into insane rages'";[30] and Mulvey possessed the strength necessary to "throw almost any grown man to the ground."[31]  A doctor, who did testify at trial, would have provided additional testimony had Tenny's attorney questioned him further.  Specifically, he would have explained that, upon visiting Tenny in the hospital after the fight,

> [Tenny] looked like he had been run over by a threshing machine. His right eye was black and

---

[25] *Tenny*, No. 1:01-CV-409-SS, at 16 ("[O]n the day of Mulvey's death, Mulvey told Parker '[s]he would kill Jim and burn the house down before she would have any of his kids come and stay or live there, or hi[m] change the status quo in any way.'"); *id.* at 19 (Father Jeremiah would have testified "that Mulvey threatened Tenny by stating 'I'm gonna kill that son of a bitch, bury him in the yard and burn the house down'").

[26] *Id.* at 19 (Father Benedict); *see also id.* at 18 (Mother Seraphima would have "testified she spoke with and observed Mulvey hours before her death, and found her to be 'absolutely out of control' and 'in a rage'" and that Mother Seraphima "saw Mulvey assault Father Jeremiah and overheard her threaten to 'burn the Monastery down'").

[27] *Id.* at 19-20 (Father Benedict).

[28] *Id.* at 19 (Father Benedict); *id.* at 21 (Tenny).

[29] *Id.* at 16 (Parker); *id.* at 19 (Father Jeremiah).

[30] *Id.* at 19 (Father Jeremiah).

[31] *Id.* at 18 (Mother Seraphima); *see also id.* at 16 ("Parker would have testified Mulvey possessed surprising physical strength . . . .").

blue, his right ear cut, and there was a tube coming out of his chest emptying blood from a punctured lung into a bag on the floor. It was clear that there had been a violent struggle in which [Tenny] had nearly lost his life.[32]

Further testimony from Tenny himself would have indicated that Tenny was aware of Mulvey's threats on his life and her other erratic behavior, and even that Mulvey had stabbed her previous husband.[33]

The district court also noted that trial counsel did not investigate or further utilize these various witnesses.[34] For example, he declined to interview Parker and Mother Seraphima, believing that the former was incompetent and that the latter had nothing to offer, despite the frequent contact Mulvey had with Parker and Mother Seraphima.[35]

Trial counsel gave as his stated reason for not pursuing testimony from Father Jeremiah and Father Benedict his concern about ongoing church sex-abuse-related scandals at the Monastery. After Mulvey's death, "Father Jeremiah and Father Benedict were indicted for what [trial counsel] described as multiple counts of

---

[32] *Id.* at 20 (Dr. Penn).

[33] *Id.* at 21.

[34] *See id.* at 16-18, 16 n.2, 22-24. As previously mentioned, the State has not challenged these deficiency holdings on appeal. The only omission that the State attempts to justify as a legitimate trial strategy is counsel's refusal to call individuals associated with the Monastery, discussed below, but that was only raised in the State's reply brief and was accordingly waived. We nonetheless briefly recount the district court's reasoning.

[35] *See id.* at 16 n.2.

10

indecency with a child" and trial counsel believed that the Monastery had a poor reputation in the community.[36] These are, of course, legitimate concerns. However, Tenny's alternatives were slim, and his attorney himself recognized that the testimony of Father Benedict and Father Jeremiah "is absolutely essential to the defense" and that "[i]t's no secret that our defense is justification."[37] Furthermore, the district court noted that Tenny could seek to alleviate the taint by requesting a change of venue, conducting *voir dire* of potential jurors to control for bias, or "apprising himself of the rules of evidence available to prohibit the State's attempts to introduce this type of character evidence."[38] Significantly, nothing implicated the nun in any misconduct at the Monastery. The fit of her testimony with that of the priests would have given it support, mitigating any rub-off of the difficulties at the Monastery.

These decisions by the defense easily were prejudicial. The jury was unconvinced by Tenny's proffered assertions of self-defense. Given the lack of independent eyewitnesses to the fight resulting in Mulvey's death, and given that the physical evidence did not conclusively establish who was the aggressor that night, the district court noted that "evidence establishing Mulvey was the

---

[36] *Id.*

[37] *Id.* at 23 (quoting Tenny's motion for continuance, made on April 30, 1999, two weeks prior to trial).

[38] *Id.* at 23-24 (citing TEX. R. EVID. 608, 609).

11

initial aggressor and Tenny possessed a reasonable apprehension of imminent death or serious bodily injury is the only evidence which could have persuaded the jury to accept Tenny's defense of self-defense . . . ."[39]  The powerful omitted testimony would have painted a very different picture of the deceased on the day she was killed.

The State argues that Tenny was not prejudiced--that is, that all of the above witnesses are irrelevant and "[t]he jury was left with no alternative than to convict Tenny of murder"--because Tenny had already admitted that his acts were not in self-defense. Tenny, however, made no such stark admission.  The State reaches its conclusion--that "Tenny himself admitted to the jury that the murder was not committed in self-defense"--by pointing to Tenny's testimony indicating that he gained control of the knife and stabbed Mulvey multiple times.

Under the State's view of self-defense, the moment Tenny took "control" of the knife, he *per se* could no longer reasonably believe himself in danger.  This is not the law, notwithstanding the State's citation to an unpublished decision of an intermediate Texas appellate court.[40]  Under Texas Penal Code § 9.32, "deadly

_____

[39] *Tenny*, No. 1:01-CV-409-SS, at 4.

[40] *See Lebron v. State*, 1999 WL 61977, at *3 (Tex. App.--San Antonio 1999). In fact, this case actually lends support to Tenny's position, given that the court only indicates that "even if [the victim] came at [the defendant] with a knife, once [the defendant] gained control of the knife, the jury *could have found* that deadly force was no longer immediately necessary," *not* that the jury *must* have so found.  *Id.* (emphasis added).

12

force" is justified (1) if the conditions of § 9.31 are met; (2) if a reasonable person would not have retreated; and (3) "when and to the degree he *reasonably believes the deadly force is immediately necessary* . . . to protect himself against the other's use or attempted use of unlawful deadly force."[41]

Here, it is clear that a jury could have concluded that Tenny still reasonably believed that deadly force was immediately necessary, even after gaining control over the knife. One flick of the lighter, which was apparently not too far from Mulvey at that point in the struggle, would have ignited Tenny's gasoline-soaked person. Tenny had already received multiple wounds from the knife, one of which collapsed his lung. Mulvey was persisting in her attacks and a jury could well credit Tenny with believing Mulvey had another weapon. Indeed, in this context, the gasoline itself could be a deadly weapon. In the heat of the fierce struggle, with all of these events happening within seconds, Tenny's reasonable fear of harm did not necessarily vanish the moment he was able to wrest some measure of control over the knife from Mulvey. The State's contrary suggestion is without merit. In other words, it

---

[41] TEX. PENAL CODE § 9.32(a) (emphasis added); *see also Holmes v. State*, 150 S.W. 926, 933-34 (Tex. Crim. App. 1912) ("[I]t must be apparent that the danger is passed, or he has reached a place where it is not reasonable for him to have fear of life or serious bodily injury at the time, before his right of self-defense would be abridged."); *Crow v. State*, 88 S.W. 814, 815 (Tex. Crim. App. 1905).

In turn, under Texas Penal Code § 9.31, subject to certain exceptions, "a person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force." TEX. PENAL CODE § 9.31(a).

13

does not directly follow from Tenny's control of the knife and intent to kill Mulvey with it that the act was not in self-defense. By definition, self-defense is a justification for an intentional killing; the key is whether Tenny "reasonably believe[d] the deadly force [wa]s immediately necessary."[42]

Of course, this is not to suggest that a reasonable jury could not, after being exposed to the omitted evidence, still reject Tenny's defense of self-defense. Rather, we merely point out that the State's contention that Tenny's testimony *foreclosed* a finding of self-defense is unpersuasive. As such, the omitted testimony is surely powerful evidence of Mulvey as the aggressor and the reasonableness of Tenny's apprehension. This evidence would have left the jury with a markedly different landscape, and "had the jury been so confronted, there is a reasonable probability that at least one juror would have refused to return a verdict of guilty."[43] Indeed, given the veritable absence of support for Tenny's self-defense theory, we think there is a *substantial* probability that the jury would have returned with a different result, enough so that our confidence in the outcome is shaken. On these facts, in light of the "totality of the evidence before the judge or jury"[44]-- or, more accurately, the *lack* of self-defense evidence--we are

---

[42] TEX. PENAL CODE § 9.32(a).

[43] *Soffar v. Dretke*, 368 F.3d 441, 479 (5th Cir. 2004).

[44] *Strickland*, 466 U.S. at 695.

14

persuaded that not only was the state habeas court incorrect on the issue of prejudice, but that its decision that no prejudice ensued was not a reasonable application of *Strickland*.

III

In sum, we are persuaded that the state court acted unreasonably in denying Tenny's IAC claim as to the guilt phase of his trial. We need not address Tenny's argument as to the sentencing phase. We also need not pause to consider Tenny's argument, even assuming that it is properly before us in the absence of a cross-appeal by Tenny,[45] that the district court erred in its adverse holdings on exhaustion and other bases for habeas relief.

AFFIRMED.

---

[45] *See Moore v. Johnson*, 194 F.3d 586, 593 (5th Cir. 1999); *see also Beltran v. Cockrell*, 294 F.3d 730, 733 (5th Cir. 2002).