# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 4, 2022

Lyle W. Cayce
Clerk

No. 21-30063

Securities and Exchange Commission,

*Plaintiff—Appellee*,

*versus*

World Tree Financial, L.L.C.; Wesley Kyle Perkins;
Priscilla Gilmore Perkins,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC 6:18-CV-1229

Before Jones, Higginson and Duncan, *Circuit Judges*.

Stephen A. Higginson, *Circuit Judge*:

This appeal arises from an enforcement action brought by the Securities and Exchange Commission (SEC) against Appellants-Defendants World Tree Financial, L.L.C. (World Tree) and its principals Wesley Perkins (Perkins) and Priscilla Gilmore Perkins (Gilmore). After a bench trial, the district court found that Perkins and World Tree engaged in a fraudulent "cherry-picking" scheme, in which they allocated favorable trades to themselves and favored clients and unfavorable trades to disfavored clients. It also found that all three Defendants made false and misleading statements

No. 21-30063

about the firm's allocation and trading practices. The court entered permanent injunctions against Perkins and World Tree, ordered them to disgorge ill-gotten gains, and imposed civil penalties on each Defendant. We AFFIRM.

## I.

## A.

In 2009, Perkins and Gilmore founded World Tree, a Louisiana-based investment adviser. Perkins served as chief executive officer and chief investment officer, and Gilmore served as chief financial officer, chief compliance officer, and chief operating officer. Perkins and Gilmore, who married in 2017, owned 60% and 40% of World Tree, respectively.

As of March 2018, World Tree managed over $54 million in assets and had 161 advisory clients, most of whom were individual investors. World Tree charged its clients an advisory fee that ranged between 0.5% and 1.5% of the client's assets under management. Because World Tree managed its clients' assets on a "discretionary basis," it had authorization to trade securities on their behalf. From December 2009 to October 2015, World Tree traded through Charles Schwab, which doubled as custodian for World Tree's client accounts.

World Tree traded through a "block trade" account, sometimes known as an "omnibus" account. A block trade, as defined by the district court, "allows a broker to execute a single large trade in its own name for the benefit of its clients and then allocate portions of that trade to particular client accounts." As chief investment officer, Perkins was responsible for trading decisions for World Tree accounts and allocating trades made through the omnibus account. He transmitted trades to Schwab by entering them in an online trading template or calling them in.

No. 21-30063

Two of World Tree's documents, its compliance manual and its Form ADV, contain important language outlining its block trade practices. In its compliance manual, World Tree recognized that block trading raises "important issues . . . concerning the equitable distribution of such securities." It announced that its policy was "to allocate [block trade] orders and opportunities in a fair and equitable manner." The manual charged Perkins, as chief investment officer, with ensuring adherence to the policy and "verify[ing] that no client account was systematically disadvantaged by the allocation."

World Tree's compliance manual also set out specific procedures for block trades. In advance of placing block trades, World Tree was to:

- Disclose its aggregation policies in its Form ADV;

  . . .

- Ensure that each client will be treated fairly and will not favor any client over another; and
- Ensure that the decision to aggregate a trade for a client is based on individual advice to that client.

When placing block trades, World Tree was to "[d]esignate on the trade order memorandum, the number of shares of the block trade to be allocated to each specific account prior to placing the order" or to "[m]ake a *pro rata* allocation of the shares to each account based upon size of the client's account." It was to maintain, in its "books and records . . . all documents that relate to allocation of block trades."

In addition, the manual prohibited Perkins and Gilmore from trading in securities that World Tree was trading or considering trading on behalf of clients. Perkins and Gilmore read and understood the compliance manual.

World Tree's Forms ADV also addressed allocation and trading procedures. A Form ADV is an annual registration form that must be filed

3

No. 21-30063

with the SEC with information about the firm and its services. Perkins and Gilmore had ultimate control over the Forms ADV: they reviewed drafts, signed them, and authorized their filing and distribution. Defendants provided Part 2A of the Forms ADV to clients when they entered a contract with World Tree and annually thereafter.

From 2011 to 2015, the Forms ADV, Part 2A, Item 11 represented that Access Persons, including Perkins and Gilmore, would not personally trade in the same securities concomitantly with their clients:

> Unless specifically permitted in World Tree's *Code of Ethics*, none of World Tree's *Access Persons* may effect for themselves or for their immediate family (i.e., spouse, minor children, and adults living in the same household as the *Access Person*) any transactions in a security which is being actively purchased or sold, or is being considered for purchase or sale, on behalf of any of World Tree's clients.

> When World Tree is purchasing or considering for purchase any security on behalf of a client, no *Access Person* may effect a transaction in that security prior to the completion of the purchase or until a decision has been made not to purchase such security. Similarly, when World Tree is selling or considering the sale of any security on behalf of a client, no *Access Person* may effect a transaction in that security prior to the completion of the sale or until a decision has been made not to sell such security.

In August 2015, World Tree amended Item 11 to reflect that Perkins and Gilmore could trade in the same securities as World Tree's clients through the omnibus account.

The Forms ADV, part 2A, Items 8 and 12 provided that World Tree "allocates investment opportunities among its clients on a fair and equitable basis" and may "combine or 'batch'" orders. Item 12 further provided that if World Tree "aggregate[s] client orders for the purchase or sale of

securities, including securities in which World Tree's *Supervised Persons* may invest, World Tree shall generally do so in accordance with applicable rules promulgated under the Advisers Act and no-action guidance provided by the staff of the [SEC]."

In mid-2015, Charles Schwab began investigating World Tree after its surveillance team detected allocations indicative of cherry-picking.[1] Schwab's investigator, Grant Moore, inquired about World Tree's "allocation process," "why [certain trades] were allocated the way they were," and "whether [World Tree] followed [its] ADV on how [it] allocated." Perkins and Gilmore explained that they surveyed clients' accounts "to see who had cash available," assessed "client objectives," and determined "whether [clients] would be able to participate or not in the day trades."

Moore requested documentation from World Tree to verify that allocations were made as outlined in the Forms ADV. Gilmore sent Moore an e-mail with documents containing incomprehensible numbers, which "made no sense" to Moore and did not show "anything about how and why they did the trade allocations the way they did." When asked for additional records, Perkins and Gilmore said they did not have any because they did not retain documentation upon completing allocations. Schwab suspended World Tree's ability to block trade and subsequently terminated its relationship with World Tree. The SEC began investigating Defendants in November 2016.

---

[1] As explained in detail below, cherry-picking involves using the block trade method to make an initial trade, and then allocating individual trades to specific accounts *after* observing how the transaction performed. Advisers can take advantage of this practice to allocate more profitable trades to favored accounts.

No. 21-30063

B.

The SEC commenced this action in September 2018. It alleged three types of fraud claims. First, it alleged that Perkins and World Tree carried out a fraudulent cherry-picking scheme, in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b); Rules 10b-5(a) and (c) thereunder, 17 C.F.R. § 240.10b-5(a), (c); Section 17(a)(1) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a)(1), (3); and Sections 206(1) and (2) of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. § 80b-6(1), (2). Second, the SEC alleged that Gilmore aided and abetted the fraudulent cherry-picking, in violation of Section 209(f) of the Advisers Act, 15 U.S.C. § 80b-9(f). Finally, the SEC claimed that Defendants made material misrepresentations about their allocation and trading practices, in violation of Section 10(b), 15 U.S.C. § 78j(b); Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b); Section 17(a)(2), 15 U.S.C. § 77q(a)(2); and, with respect to Perkins and World Tree only, Sections 206(1) and (2), 15 U.S.C. § 80b-6. The SEC sought injunctive relief, disgorgement of all ill-gotten gains, and civil penalties.

The district court held a four-day bench trial in November 2020. It received over 150 exhibits and heard testimony from Perkins, Gilmore, and two expert witnesses—Dr. Cathy Niden for the SEC and Dr. Charles Theriot for Defendants—as well as other witnesses.

In making its case, the SEC relied heavily on statistical data. The timing of the allocations was critical to the SEC's argument that Perkins would have known how the trades had performed that day by the time he allocated them. The SEC presented evidence that Perkins transmitted most trades to Schwab during the trading day, but that 90% of the time he waited until the markets closed to allocate the trades.

No. 21-30063

To analyze World Tree's allocation data, Niden divided the client accounts into three categories: (1) accounts controlled by Perkins, Gilmore, or both ("Favored-Perkins accounts"); (2) accounts owned by World Tree clients other than Matthew LeBlanc and his business Delcambre Cellular ("Favored-Client accounts"); and (3) accounts owned by LeBlanc and Delcambre ("Disfavored accounts"). She then measured several performance measures and subsets of trades: most and least profitable trades, day trades, average first-day returns, earnings-day trades, overlapping stocks, and trades after LeBlanc complained to Perkins about his accounts' poor performance. According to her analysis, from July 2012 to July 2015, Perkins methodically allocated trades with favorable first-day returns to the Favored-Perkins and Favored-Client accounts, while allocating trades with unfavorable first-day returns to the Disfavored accounts.

Niden opined that the "evidence overwhelmingly indicates that Perkins engaged in cherry-picking." Though she acknowledged at trial that the data reflected only a pattern and that she did not "have the ability to identify individual trades that may or may not be improper," the data in the aggregate showed a "one in one million chance that these patterns could have occurred if allocations were being made without regard to first-day return." The district court found Niden credible and her testimony to be "thorough and compelling."

Theriot opined that Niden incorrectly interpreted the "incomplete and fragmented data" she utilized. Theriot took issue with her use of "real monetized gains for day trades and unrealized 'First-Day Profits' for stocks not sold on the date purchased as the sole indicator of whether cherry-picking occurred." Theriot claimed Niden's report reflected (1) "flawed assumptions," including that "all World Tree clients are identical and should receive identical returns"; (2) "a measurement methodology that is inconsistent with the reality of the investment returns actually realized"; (3)

"errors in interpreting and using the data available"; and (4) "an apparent lack of independence and objectivity," because Niden is employed by the SEC. Theriot opined that no cherry-picking occurred.

Perkins testified to the allocations and tried to explain the data patterns. For example, he claimed the Disfavored accounts solely experienced certain losses because they had "more money" and "a lot more trades as a result." He insisted trades were made on behalf of specific clients at specific times in furtherance of individual clients' financial and investment goals. Perkins also testified that he knew what cherry-picking was, he acknowledged that it was wrong, and he denied doing it. The court found him not credible, as his explanations "appeared implausible or largely beside the point" and his demeanor appeared "evasive or defensively argumentative."

The district court found Defendants liable on all claims except the aiding and abetting claim against Gilmore. It considered Niden's analysis "compelling proof of intentional cherry-picking, as there is simply no other plausible explanation for the patterns in the data." While Theriot "could explain *some* of the disproportionate results," his observations did not speak to the clear pattern indicative of cherry-picking. The court "did not believe" Perkins when he claimed he did not cherry-pick. As to the misrepresentations, the court found that Perkins and Gilmore told their clients they would not trade in the same securities as them but did so anyway.

The court permanently enjoined World Tree and Perkins from further violating federal securities laws through cherry-picking. It ordered that Perkins and World Tree, jointly and severally, disgorge $347,947 plus $36,335.98 in prejudgment interest. The court also ordered civil penalties of $160,000 on Perkins, $300,000 on World Tree, and $80,000 on Gilmore. Defendants timely appealed.

## II.

On appeal from a bench trial, we review findings of fact for clear error and questions of law *de novo. Am. Guar. & Liab. Ins. Co. v. ACE Am. Ins. Co.*, 990 F.3d 842, 846 (5th Cir. 2021). We will disturb a factual finding "only if we are 'left with the definite and firm conviction that a mistake has been committed.'" *Deloach Marine Servs., L.L.C. v. Marquette Transp. Co.*, 974 F.3d 601, 606-07 (5th Cir. 2020) (citation omitted). The clear-error standard "following a bench trial requires even 'greater deference to the trial court's findings when they are based on determinations of credibility.'" *Luwisch v. Am. Marine Corp.*, 956 F.3d 320, 326 (5th Cir. 2020) (quoting *Guzman v. Hacienda Records & Recording Studio, Inc.*, 80 F.3d 1031, 1036 (5th Cir. 2015)). We employ "a strong presumption that the court's findings must be sustained even though this court might have weighed the evidence differently." *Id.* We review disgorgement and civil penalty orders for abuse of discretion. *SEC v. Kahlon*, 873 F.3d 500, 504 (5th Cir. 2017) (per curiam) (collecting cases).

## III.

Defendants challenge the district court's findings that Perkins and World Tree engaged in fraudulent cherry-picking and that Defendants misrepresented World Tree's allocation and trading practices. They also challenge the disgorgement assessment.

Section 10(b) of the Exchange Act makes it unlawful for a person "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance" in violation of SEC rules. 15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful, "in connection with the purchase or sale of any security," to "employ any device, scheme, or artifice to defraud"; "make any untrue statement of a material fact"; or "engage in

any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5.

To prevail on a claim under Section 10(b) and Rule 10b-5, the SEC must prove, by a preponderance of the evidence, that the defendant "(1) made a misstatement or omission (2) of material fact (3) in connection with the purchase or sale of securities (4) with *scienter*." *SEC v. Gann*, 565 F.3d 932, 936 (5th Cir. 2009). A statement is "'material' if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 359 (5th Cir. 2002) (quoting *R&W Tech. Servs. Ltd. v. CFTC*, 205 F.3d 165, 169 (5th Cir. 2000)). To satisfy the in-connection-with element, the fraudulent scheme and sale of securities need only "coincide." *SEC v. Zandford*, 535 U.S. 813, 822 (2002).

Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)); *see also Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004). Scienter is satisfied by a showing of "severe recklessness," *i.e.*, "an extreme departure from the standards of ordinary care." *Alaska Elec. Pension Fund v. Flotek Indus., Inc.*, 915 F.3d 975, 981 (5th Cir. 2019) (quoting *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 866 (5th Cir. 2003)).

Section 17(a) of the Securities Act outlaws "substantially the same" conduct as Section 10(b) and Rule 10b-5, *SEC v. Spence & Green Chem. Co.*, 612 F.2d 896, 903 (5th Cir. 1980), but covers acts committed "in the offer or sale of any securities," 15 U.S.C. § 77q(a).[2] Subsection (a)(1) requires

---

[2] *Compare id.* ("It shall be unlawful for any person in the offer or sale of any securities . . . (1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a

scienter, while subsections (a)(2) and (a)(3) require only negligence. *Aaron v. SEC*, 446 U.S. 680, 697 (1980).

Section 206 of the Advisers Act makes it "unlawful for any investment adviser"[3] "(1) to employ any device, scheme, or artifice to defraud any client or prospective client" or "(2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." 15 U.S.C. § 80b-6. Subsection (1) requires scienter, while subsection (2) requires only negligence. *Steadman v. SEC*, 603 F.2d 1126, 1134 (5th Cir. 1979); *see also SEC v. Steadman*, 967 F.2d 636, 643 n.5 (D.C. Cir. 1992).

## A.

The district court found Perkins and World Tree engaged in a fraudulent cherry-picking scheme in violation of Section 10(b), Rule 10b-5, Section 17(a)(1), and Sections 206(1) and (2). The district court defined cherry-picking as a manipulation associated with block trades wherein "because client allocations occur after an initial larger trade, an unscrupulous broker could manipulate those allocations based on whether the asset(s) involved in the block trade increased or decreased in value in the period of time between the initial transaction and the allocations."[4] Perkins and World

---

material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."), *with id.* § 78j(b), *and* 17 C.F.R. § 240.10b-5.

[3] It is undisputed that Perkins and World Tree were investment advisers.

[4] Similarly, the SEC has described cherry-picking as: "a practice in which securities professionals allocate profitable trades to a preferred account (like their own) and less profitable or unprofitable trades to a non-preferred account (like a customer's). To cherry pick a trade, a securities professional typically originates the trade in an omnibus firm account, without identifying the underlying . . . account for which the trade was placed, and

No. 21-30063

Tree dispute the finding of cherry-picking on appeal, arguing that: (1) the "in-the-offer-or-sale" element of Section 17(a)(1) was not satisfied; (2) the SEC did not prove its claims by a preponderance of evidence because it relied exclusively on statistics and introduced no direct evidence of cherry-picking, and, in addition, Niden's statistical analysis was flawed; and (3) similarly, the SEC could not prove scienter without direct evidence of cherry-picking. We affirm the district court's factual findings and legal conclusions.

1.

Though we have not yet addressed a cherry-picking fraud theory, several courts (and the SEC) have found that cherry-picking can be a violation of Section 10(b), Rule 10b-5, Section 17(a)(1), and Sections 206(1) and (2).[5] The failure to disclose cherry-picking constitutes material misrepresentations or omissions because there is "a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *ABC Arbitrage*, 291 F.3d at 359 (internal quotation marks omitted). Because cherry-picking involves allocating more

then allocates the trade to an account after observing how that transaction performed." *The Dratel Grp., Inc.*, Exchange Act Release No. 77396, 2016 WL 1071560, at *1 (Mar. 17, 2016).

[5] *See SEC v. RRBB Asset Mgmt., LLC*, No. 20-12523, 2021 WL 3047081, at *3 (D.N.J. July 20, 2021) (Section 10(b), Rule 10b-5, Section 17(a)(1) and (2), and Sections 206(1)-(2)); *SEC v. Strong Inv. Mgmt.*, No. 18-cv-00293, 2018 WL 8731559, at *4-6 (C.D. Cal. Aug. 9, 2018) (same); *SEC v. K.W. Brown & Co.*, 555 F. Supp. 2d 1275, 1302-09 (S.D. Fla. 2007) (same); *see also SEC v. Aletheia Research & Mgmt. Inc.*, No. CV 12-10692, 2015 WL 13404306, at *2 (C.D. Cal. May 11, 2015) (Section 10(b), Rule 10b-5, and Sections 206(1)-(2)); *see also Joseph C. Buchanan*, Exchange Act Release No. 5329, 2019 WL 4033999, at *1-3 (Aug. 26, 2019) (Section 10(b), Rule 10b-5, and Sections 206(1)-(2)); *Fin. Sherpa, Inc.*, Exchange Act Release No. 5324, 2019 WL 3933686, at *1, *4 (Aug. 20, 2019) (same); *J.S. Oliver Cap. Mgmt., L.P.*, Securities Act Release No. 5236, 2019 WL 2160136, at *7 (May 16, 2019) (Section 10(b) and Rule 10b-5); *Welhouse & Assocs., Inc.*, Exchange Act Release No. 4132, 2015 WL 3941618, at *1, *5-6 (June 29, 2015) (Section 10(b), Rule 10b-5, and Sections 206(1)-(2)); *cf. Moross Ltd. P'ship v. Fleckenstein Cap., Inc.*, 466 F.3d 508, 515-17 (6th Cir. 2006) (state securities-fraud statutes).

profitable trades to certain accounts, an adviser is "stealing from one customer to enrich himself," *Dratel*, 2016 WL 1071560 at *1, and thus the practice implicates a conflict of interest. *See Laird v. Integrated Res., Inc.*, 897 F.2d 826, 835 (5th Cir. 1990) ("[W]e hold that for the purpose of rule 10(b)-5, an investment adviser is a fiduciary and therefore has an affirmative duty of utmost good faith to avoid misleading clients. This duty includes disclosure of all material facts and all possible conflicts of interest.").

Furthermore, cherry-picking occurs "in connection with the purchase or sale of any security" (Rule 10b-5) and "in the offer or sale of any securities" (Section 17(a)). It is not necessary for a specific trade or a specific purchaser or seller to be identified to satisfy the in-connection-with element. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) (explaining the broad interpretation of the "in connection with" phrase, and holding that "it is enough that the fraud alleged 'coincide' with a securities transaction—whether by the plaintiff or by someone else"). Moreover, placing trades with a broker satisfies the in-the-offer-or-sale element because the terms cover "the entire selling process, including the seller/agent transaction." *United States v. Naftalin*, 441 U.S. 768, 772-73 (1979).[6]

2.

Nor are we persuaded by the argument that the SEC needed to introduce direct evidence of cherry-picking to prove its claims, rather than relying on statistical evidence. Statistical evidence, like all evidence, "is a

---

[6] Though Perkins and World Tree argue before us that the in-the-offer-or-sale element of Section 17(a)(1) is not met because "the SEC excluded all sales transactions from [its] analysis and relied exclusively on unrealized gains and losses, which is inherently **before** a sale occurs," they do not point to where they raised this argument before the district court. Accordingly, the argument is waived and we do not address it. *See In re Deepwater Horizon*, 857 F.3d 246, 250-51 (5th Cir. 2017).

means to establish or defend against liability" and "[i]ts permissibility turns not on the form a proceeding takes—be it a class or individual action—but on the degree to which the evidence is reliable in proving or disproving the elements of the relevant cause of action." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 454-55 (2016). District courts have "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Statistical evidence can be useful in securities cases, and its admission is no novelty.[7]

Because cherry-picking is "difficult to detect," determining whether it has occurred "often requires drawing inferences from a pattern of behavior, irregularities, and trading data." *Dratel,* 2016 WL 1071560, at *2. Here, Niden opined that there was "less than a one in one million chance" that the patterns could have occurred if the allocations were made without regard to first-day return.[8]

---

[7] *See, e.g.*, *United States v. Khalupsky*, 5 F.4th 279, 294 (2d Cir. 2021) (noting in a criminal securities-fraud case, the "government's pretrial disclosures of exhibits about the trades it intended to rely upon and of the vast data set underlying its statistical analysis of his trading activity"); *In re BP P.L.C. Sec. Litig.*, No. 10-md-2185, 2013 WL 6388408, at *15 (S.D. Tex. Dec. 6, 2013) (noting "statistical regression analys[e]s that examine[] the effect of an event on a dependent variable, such as a corporation's stock price," are "commonly used in securities fraud class actions" (citations omitted)); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 798-801 (S.D. Tex. 2008) (assessing statistics on "class action settlements involving 'mega fund' recoveries" to determine fee award); *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 225, 229 (D.N.J. 2000) (holding statistical evidence created fact question on negative causation defense); *Schindler v. Stockley*, No. 83 Civ. 2186, 1985 WL 2338, at *4-5 (S.D.N.Y. Aug. 16, 1985) (holding, after bench trial in churning case, that "the overwhelming objective statistics outweigh[ed]" defendant's explanations for overtrading); 7 ALAN R. BROMBERG ET AL., BROMBERG & LOWENFELS ON SECURITIES FRAUD § 13:114 (2d ed.), Westlaw (database updated May 2022).

[8] *See K.W. Brown*, 555 F. Supp. 2d at 1304 (finding it "more likely than not" that defendants engaged in cherry-picking because "market forces" could not explain their

No. 21-30063

Of course, "a statistical analysis is only as reliable as the assumptions beneath it." *Nat'l Ass'n of Gov't Emps. v. City of San Antonio*, 35 F.3d 560, 1994 WL 499782, at *5 (5th Cir. 1994) (per curiam). Perkins and World Tree challenge Niden's analyses on several grounds: she used "unrealized 'first day results,' which show only unrealized gains and losses"; she did not use a "comparator"; she disregarded differences between Favored and Disfavored accounts; she employed a result-driven approach; and she did not use all available information. These arguments, however, revisit Theriot's trial critique of Niden's analyses. Defendants do not assert that their expert's testimony was improperly restricted in any way. Instead, the district court considered each expert's account and found that Theriot failed to rebut key points of Niden's analyses. The district court found that Niden's analyses showed Perkins "allocated an overwhelming proportion of positive trades to Favored-Perkins and Favored-Client accounts and an overwhelming proportion of negative trades to the Disfavored accounts." While Theriot's testimony "explain[ed] *some* of the disproportionate results," it "did not alter the Court's conclusion that the only plausible explanation for the disproportional losses in the Disfavored accounts and gains in the Favored accounts is cherry-picking." Importantly also, the court heard Perkins' explanations for the allocation patterns firsthand, yet found them "implausible or largely beside the point." It "did not believe him when he claimed that he did not engage in cherry-picking."[9]

---

receipt of "more than 90% of the winners while investors received nearly 90% of the losers"); *Fin. Sherpa, Inc.*, 2019 WL 3933686, at *2 (finding "difference in the returns [to be] statistically significant"); *Joseph C. Buchanan*, 2019 WL 4033999, at *3 (finding trade data "statistically significant in that the likelihood of these same-day profitable trades being randomly allocated . . . are less than one in one billion").

[9] In addition to close credibility assessment of all parties' experts and Perkins himself, we note that the district court made further supportive findings which did not rest on expert statistical analysis: (1) the court heard testimony from Moore describing the

No. 21-30063

We "may not second-guess the district court's resolution of conflicting testimony or its choice of which expert[] to believe." *Grilletta v. Lexington Ins. Co.*, 558 F.3d 359, 365 (5th Cir. 2009); *see Luwisch*, 956 F.3d at 329. Perkins and World Tree have not convinced us that there is error, clear or otherwise, in the district court's reasoning or fact-finding.[10] Where, as here, "there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Guzman*, 808 F.3d at 1036 (quoting *In re Luhr Bros., Inc.*, 157 F.3d 333, 338 (5th Cir. 1998)).

3.

Finally, as other courts have pointed out, cherry-picking can satisfy the scienter element because it involves the knowing conduct of picking certain accounts over others. *RRBB*, 2021 WL 3047081, at *3. The "scheme

_____

cryptic documentation of allocations and the response he received that the information about allocations was deleted every day after the allocation process was complete; the court found that Moore's "concerns regarding the Perkins' allocations practices and their response to his investigation were reasonable and well-founded"; and (2) the court observed Matthew LeBlanc and credited his testimony that he "did not want to lose money with his World Tree investments, either for tax purposes or any other reason, and that he never directed, authorized, or expected Wesley Perkins to disproportionately allocate losses to his accounts."

[10] Perkins and World Tree cite to *SEC v. Slocum, Gordon & Co.*, 334 F. Supp. 2d 144 (D.R.I. 2004), a case in which the district court held that the SEC failed to show cherry-picking through statistical evidence. In that case, however, the court *credited* the defendants' testimony that trades represented legitimate client strategies. *Id.* at 172-73 (observing that the SEC's statistics showed defendants' "trading strategy in operation"). The court also *credited* the testimony of a nonparty employee who "was involved with processing the paperwork on virtually every trade" and concluded "no cherry picking scheme could have taken place . . . without her knowledge." *Id.* at 175-76. Here, conversely, the district court found Perkins *not* credible and his allocation explanations "implausible." And where the evidence is in "equipoise, making critical the question of credibility," and the district court adopts one party's version of the facts based on a credibility determination, we defer to its factual finding. *Gann*, 565 F.3d at 939; *see also Guzman*, 808 F.3d at 1036 (noting factual findings based on credibility determinations "can virtually never be clear error" (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985))).

require[s] specific preparation and the deliberate allocation of a disproportionate number of profitable trades." *Id.* (quoting *James C. Dawson*, Advisers Act Release No. 3057, 2010 WL 2886183, at *5 (July 23, 2010)); *K.W. Brown*, 555 F. Supp. 2d at 1305 (finding scienter in cherry-picking where trader "knowingly . . . allocate[d] profitable day trades to an account in which [accomplice] had a personal financial interest"); *see also Dratel*, 2016 WL 1071560, at *11 (finding scienter where broker "controlled all of the trading and allocation decisions [and] therefore knew that he was trading in the same securities as his customers and . . . favoring his own account over theirs").

Perkins and World Tree argue that, without direct evidence of cherry-picked allocations, the SEC cannot show scienter. However, it is well settled that "scienter may be established by circumstantial evidence." *SEC v. Fox*, 855 F.2d 247, 253 (5th Cir. 1988) (first citing *Dirks v. SEC*, 463 U.S. 646, 663 (1983); and then citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n.30 (1983)); *United States v. Ruggiero*, 56 F.3d 647, 655 (5th Cir. 1995) (noting that "in proving scienter in fraud cases, 'circumstantial evidence can be more than sufficient'" (quoting *Huddleston*, 459 U.S. at 390 n.30)). Here, the district court (1) observed that cherry-picking "necessarily involves knowing and intentional conduct," (2) found that scienter was "confirmed by the testimony of Wesley Perkins," and highlighted other facts, such as the daily deletion of allocation documentation, and (3) further found that "the facts of this case provide strong evidence of scienter on the part of Wesley Perkins." We hold that this constituted adequate circumstantial evidence to find that Perkins engaged in cherry-picking and acted with scienter.

Accordingly, there being no clear error in the district court's finding that Perkins and World Tree engaged in fraudulent cherry-picking, we affirm their liability under Section 10(b), Rule 10b-5, Section 17(a)(1), and Sections 206(1) and (2).

No. 21-30063

B.

The district court also found that Defendants misrepresented their trading practices by trading in the same securities as their clients despite stating in their Forms ADV that they did not, in violation of Section 10(b), Rule 10b-5(b), Section 17(a)(2), and, with respect to Perkins and World Tree only, Sections 206(1) and (2).[11] Defendants dispute this finding on appeal, arguing that the Forms ADV allowed them to trade in the same securities as their clients—thus, according to Defendants, they made no misleading or material statements with scienter.

Defendants find no support in the record. The Forms ADV, Part 2A, Item 11 specifically represented that "Access Persons," *i.e.*, Perkins and Gilmore, would *not* personally trade in the same securities at the same time as their clients. World Tree's compliance manual, or code of ethics, contained a similar restriction. Moreover, it is undisputed that Perkins allocated to his and Gilmore's personal accounts the same securities from the block trades in which their clients participated. The only qualifier to this language[12] came in August 2015—after Schwab began its investigation. At

---

[11] The district court also found that Perkins and World Tree misrepresented their allocation practices by telling clients they were allocating block trades fairly and equitably, in violation of Section 10(b), Rule 10b-5(b), Section 17(a)(2), and Sections 206(1) and (2). Perkins and World Tree have waived any challenge to this finding by failing to brief it. *Tenny v. Dretke*, 416 F.3d 404, 407 (5th Cir. 2005).

[12] Though Defendants argue that the Forms ADV expressly permitted them to trade in the same securities as their clients, they do not cite to any language giving them such permission. They point instead to the firm's Discretionary Investment Management Agreement with clients, but that document only notes, broadly and in passing, that "[t]o the extent that we aggregate client orders for the purchase or sale of securities, including securities in which our Advisory Affiliates may invest . . . ." Defendants also argue that the prohibitory language in Item 11 of the Forms ADV includes a qualifier: "Unless specifically permitted in World Tree's *Code of Ethics*." But this qualifier does not help Defendants where they cannot, and do not, point to any language in the code of ethics permitting such trading. In fact, the code of ethics restricted such trading. Defendants also point to Item 11,

18

No. 21-30063

that point, World Tree changed its Form ADV to allow concomitant trading, amending Item 11 to provide: "the Firm's Supervised Persons are permitted to buy or sell securities that it also recommends to clients if done in a fair and equitable manner that is consistent with the Firm's policies and procedures." Until this language was added, Perkins and Gilmore were restricted from trading concomitantly with their clients—a restriction that Defendants defied.

Defendants' misrepresentations were material. Materiality is a "fact-specific inquiry," *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988), and assessing "the significance of the inferences a reasonable investor would draw from a given set of facts is peculiarly within the competence of the trier of fact," *Steadman*, 603 F.2d at 1130. Here, the district court found that a reasonable investor would consider important whether Defendants traded in the same securities as their clients. This is logical: an adviser who participates in block trades with his clients has a greater incentive to place his interests ahead of theirs. *See, e.g.*, *Capital Gains*, 375 U.S. at 196 (explaining an investor is entitled to evaluate "overlapping motivations, through appropriate disclosure, in deciding whether an adviser is serving two masters or only one, especially if one of the masters happens to be economic self-interest" (cleaned up)); *Vernazza*, 327 F.3d at 858-59 ("We have no trouble concluding that the petitioners made materially false statements when they claimed not to recommend securities in which they had an ownership or sales interest, not to receive economic benefits in connection with giving advice to clients, and not to recommend securities in which they had a financial

---

which provides that "World Tree and persons associated with World Tree ('Associated Persons') are permitted to buy or sell securities that it also recommends to clients consistent with World Tree's policies and procedures." Again, however, World Tree's policies and procedures restricted personal trades in the same securities at the same time for access persons.

interest. It is undisputable that potential conflicts of interest are 'material' facts with respect to clients and the Commission.”). Defendants argue that LeBlanc did not care if they invested in the same securities as him. However, the standard for materiality is objective and the SEC was not required to prove that any investor actually relied on Defendants' misrepresentations. *SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 779 (5th Cir. 2017); *SEC v. Blatt*, 583 F.2d 1325, 1331-32 (5th Cir. 1978). Regardless, LeBlanc testified that he would have wanted to know that his investment advisers were block trading in the same securities.

Finally, Defendants argue that the district court erred in finding that they misrepresented their trading practices with scienter. However, this claim was premised on their argument that they were permitted to trade in securities concomitantly with clients, which, as discussed above, is not true. In any event, the district court did not err; Perkins and Gilmore reviewed, understood, and authorized the Forms ADV and World Tree's compliance manual. They were aware of the prohibition in these documents against trading the same securities that Perkins and World Tree were trading for clients. Furthermore, they knew Perkins was doing just that. We hold that the record supports the district court's finding of scienter. *See SEC v. Sethi*, 910 F.3d 198, 206-08 (5th Cir. 2018) (affirming district court's finding of material misstatements where there was evidence the defendant knew he did not have relationships with major oil companies but repeatedly represented such relationships to entice investors).

## C.

The district court ordered that Perkins and World Tree, jointly and severally, disgorge $347,947 in ill-gotten gains, as well as $36,355.98 in

prejudgment interest.[13] Perkins and World Tree raise several objections to the disgorgement award. Disgorgement "is an equitable remedy meant to prevent the wrongdoer from enriching himself by his wrongs." *Allstate Ins. Co. v. Receivable Fin. Co.*, 501 F.3d 398, 413 (5th Cir. 2007) (quoting *SEC v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993)). District courts ordinarily have "broad discretion" in determining a disgorgement award. *Huffman*, 996 F.2d at 803 (citing *CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71, 76 (3d Cir. 1993)); *see also SEC v. AMX, Int'l, Inc.*, 7 F.3d 71, 73 (5th Cir. 1993).

Here, the SEC approximated Perkins and World Tree's profits with Niden's analysis. The district court summarized Niden's analysis in its opinion, writing that Niden "determined the overall first-day profits and first-day rates of return for all trades in the omnibus account, and then hypothetically apportioned them in a fair manner (pro rata) among the different account types." Niden "then calculated the difference between what each group would have received in the hypothetical fair allocation and the actual performance of each group." The district court found reasonable Niden's method and estimation of the excess first-day profits Perkins and World Tree derived from the cherry-picking scheme.

Perkins and World Tree argue to this Court that the disgorgement amount is improperly based on the Disfavored accounts' unrealized first-day losses and thus the amount is larger than actual net profits from wrongdoing and amounts to unjust equitable relief to the victim; they also claim that the disgorgement award improperly includes Schwab's commission fee. Perkins and World Tree base their arguments on *Liu v. SEC*, 140 S. Ct. 1936, 1940 (2020), a case in which the Supreme Court held that "a disgorgement award

---

[13] Though the district court also imposed civil penalties against each Defendant, Defendants do not brief any challenges to the civil penalties and thus waive any related issues. *See, e.g.*, *United States v. Scroggins*, 599 F.3d 433, 446-47 (5th Cir. 2010).

that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under [15 U.S.C.] § 78u(d)(5)." *Liu* additionally held that "courts must deduct legitimate expenses before ordering disgorgement under § 78u(d)(5)" to "ensure that any disgorgement award falls within the limits of equity practice while preventing defendants from profiting from their own wrong." *Id.* at 1950. *Liu* is a seminal case that has, and will continue to, shape disgorgement awards. *See also SEC v. Blackburn*, 15 F.4th 676, 681-82 (5th Cir. 2021) (assessing challenge to a disgorgement remedy post-*Liu*); *SEC v. Hallam*, No. 21-10222, 2022 WL 2817119, at *15 (5th Cir. July 19, 2022) (laying out the question of whether *Liu* requires the SEC to "satisfy the requirements of a traditional equitable remedy" when successfully requesting a disgorgement remedy, or whether the only limitations on disgorgement remedies are those explicitly set out in the *Liu* opinion itself).

In this case, however, Perkins and World Tree did not challenge the SEC's proposed disgorgement amount in their pretrial or posttrial submissions—instead, they argued only that there was no "basis for disgorgement."[14] Nor did Perkins and World Tree propose specific deduction amounts, either before the district court or to this court. *See SEC v. Fowler*, 6 F.4th 255, 267 (2d Cir. 2021) ("Fowler failed to identify any additional 'legitimate' business expenses that, consistent with *Liu*, should have been deducted from an otherwise reasonable disgorgement amount. Yet it was his burden to do so. We therefore decline to remand to the District

---

[14] A legitimate business expense deduction argument was available at the time. *Liu* was decided on June 22, 2020, and the district court's opinion in this case came down January 15, 2021. Additionally, the Tenth Circuit has observed that even before *Liu* was decided, "an argument by defendants to secure a deduction of business expenses from a disgorgement amount, *was* available," and, indeed, was "hardly novel." *SEC v. GenAudio Inc.*, 32 F.4th 902, 949-50 (10th Cir. 2022).

No. 21-30063

Court on this issue."). *Liu* does not require the district court to conduct its own search for business deductions that defendants have not identified. Accordingly, we hold that the district court did not abuse its discretion in ordering disgorgement.[15]

## IV.

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

[15] Perkins and World Tree also challenge the imposition of joint and several liability under *Liu*. However, *Liu* allows for such liability where "partners engaged in concerted wrongdoing"—exactly the situation here. *See Liu*, 140 S. Ct. at 1949 ("The common law did, however, permit liability for partners engaged in concerted wrongdoing. The historic profits remedy thus allows some flexibility to impose collective liability." (internal citation omitted)). Of note, the district court here carefully determined that "the SEC did not establish that [Gilmore] participated in the cherry-picking scheme" and thus concluded that, where Gilmore and Wesley Perkins did not marry until years after the period of misconduct, and where "no wrongful profits resulted directly from [Gilmore]'s violations," she was *not* personally nor jointly and severally liable for the disgorgement.